United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and an honorable court. Good morning. Our first case this morning is Epistar Corporation v. the ITC. Mr. Goldstein. Good morning, Your Honors. This case presents a question of licensee estoppel to questions of claim construction. I'd like to start with the licensee estoppel issue. The question here is the effect of the UEC-Lumileds agreement after UEC merged with Epistar, of course. And there's some common ground in the case. We all agree that to effectuate that settlement, that when Epistar and UEC merged, Epistar was bound by the estoppel as to UEC's products, the products that that company made. We disagree, however, about the effect of the merger and the agreement on products that Epistar was making before the merger. The other side seemingly accepts that if the UEC-Lumileds agreement had a provision that said, look, we'll arbitrate all disputes or there'll be a covenant not to sue, that that wouldn't affect Epistar in all of its separate operations. And that's the holding of cases like Medtronic from the Third Circuit, which cites the spindle fabric decision in this case. But it says that there's a different rule, a different rule that applies to licensee estoppel. And we think that that gets matters exactly backwards, and there are two reasons. The first is that there's a serious question of patent policy here, and that comes from the Lear v. Adkins case, the Supreme Court, which this Court has interpreted, of course, in a number of decisions and said, look, Lear does say you can't just contract out of your right to challenge the liberty of a patent, but if you have a settlement agreement, we're going to enforce it to the same extent we would a judgment in the case. Because we have to have settlements. That's an important policy. But the Lear v. Adkins rule is interpreted in cases like Foster v. Halco, like Ecolab, does say that you can't have a consent judgment that stretches beyond the bounds of race judicata. So here we have a situation where UEC and LumaLeds were fighting each other in court and they decided to settle. And that settlement has to be enforced. And it can be enforced when it comes to licensee estoppel as far as a judgment in that case would have run. So now we're Epistar and we've merged with UEC. Your problem here is that the language of the agreement and the language of the merger agreement would seem to be clear on its face. And you're arguing that it should be interpreted more narrowly than the language would suggest, right? I guess that's part of our argument. If I could just lay out arguments and then address this point. We do have a patent policy argument that says the language could say anything it wants, but it must be construed in— But what cases have said that we don't apply the clear language? I mean, we do in Foster v. Halco and Halco and these other cases, most recently in NASLOC. We've said that if you're clear about it, we'll do it. We'll find that the policy isn't implicated under those circumstances. Could I just disagree slightly with holding those cases, including your opinion in Ecolab? I think that those are confronting a slightly different point. The question that was raised in Foster and then subsequent cases, including Ecolab, is, is the language of the contracts broad enough to extend from claim preclusion to issue preclusion, so that it's not just the particular products that were at issue in the case that gave rise to the consent judgment, but would give rise to issue preclusion across the board so that UEC here, for example, couldn't challenge validity as to any new product it came up with in the future. And those cases confront the question, how broad does the language have to be? And we don't think that they have the Ecolab— You'd agree, wouldn't you, that if it wasn't an Epistar product and there had been no merger, that there would be preclusion as to new product, right? If it were UEC, that's exactly right. And so let me explain why it is that after the merger the rule is different. And the reason is that the rule of issue preclusion and appraised judicata is that it extends as far as it's the same party. So anything that UEC did in the future or any successor to UEC that's in privity with UEC. And it's uncontested here that we are not in privity with UEC as to the OMA products, which are our basis for contesting validity. Remember, they are completely independent of GB and MB, which are the UEC products. And if I could just give a hypothetical that I think will illustrate this, why this can't be the right result, the one that Lumileds wanted and that the ITC adopted. Imagine that Google buys some tiny little company, some pipsqueak company that's one one-hundredth of its size. Nobody would seriously say that an agreement not to contest validity would spread through like a virus through all of Google. Now, Google can't evade the promise that the first company made. But the question of patent policy and the question of contract construction is it extends only so far as the original promise. Yeah, but you can – it's within your control. If you want to avoid the problem, all you have to do is retain the corporate form the way it was instead of having a merger in which there's a single corporate survivor. Well, a couple of things. First, the question of patent policy is independent of corporate structure, and I don't think that patent policy is intended to discourage. But isn't that true, that you could avoid the problem? If in this merger Epistar had maintained the corporate form and simply made the acquisition or created the merger by making UED into a subsidiary, the whole problem would have been avoided, right? It wouldn't have been a merger then. It would have been a subsidiary. That's true. But can I just – I'm sorry. Why not in your Google hypothetical require Google to handle that contractually, to say we have assumed all obligations but we would retain certain rights as to preexisting products? Well, we do think that was the effect of this merger. But why wouldn't you make that explicit in the agreement instead of saying, as this agreement appears to say, that you assume all the obligations? Well, remember, of course, under the ITC's holding that that solution wouldn't help us because it's the original UEC contract that, according to the ITC, gets us into trouble. It's the fact that UEC promised to bind its successors. But the court is focused on the language of the agreements and their effect, and so maybe I can turn to that question. But if the merger agreement had somehow set it aside, that would be a different – we'd have a different case, wouldn't we? It's conceivable, not according to the ITC. But in all events – I would have thought your answer to the question was that as a matter of corporate law, when you have a merger, you have to have the merged entity succeed. That you can't, under those circumstances, deal with it contractually. I don't know whether that's true or not, but I would have thought that that was an issue. It's certainly true as a matter of Taiwanese law. It is true in the states that we have studied. It is not a question of federal common law. It's a question of state corporate law. It's our understanding that that's right as a matter of state corporate law. We couldn't carve it out as a matter of law. But you didn't address that. You didn't address that in the brief, right? That's right, but it's because our agreement does say that we take all of the obligations of UEC. If I could turn to the legal implications of this succession, there are – You can't try to challenge validity, right? You can't challenge validity. That's your big problem, right? Right now, according to the ITC, we think that that's erroneous, absolutely, under Lear v. Atkins and what the effect of these successor provisions is. And the court has been operating in its questions on the understanding that the plain language of the agreements would bind Epistars to its own independent products. And let me turn to why I think that that's just simply not right. There is a line of cases with the Medtronic case citing this court's decision and Spindle Fabric and a whole series of cases that say, yes, you have these successor provisions. And merger partners do take on the obligations and the rights of their predecessors. But that just means that they take them on to the same extent. It doesn't expand those rights. And that's the effect here, and that is that LumaLeds does have the right against Epistar to enforce the agreement as to the MB and GB products and to their successors, but not as to something that Epistar developed independently. And that's very clear as a matter of what parties would intend. There isn't a serious argument from the other side that when ITC cut its deal with UEC that UEC was making a promise that, look, if I ever merge with somebody or if I'm ever acquired by somebody, this obligation not to contest the 718 patent will suddenly explode into a promise about all of its operations. And then we have a second layer of argument, one if, Judge Rader, you're focused on sort of what the special facts of this case are. We do have a separate agreement between Epistar and LumaLeds. And the inescapable upshot of that, particularly as it follows on the heels of the UEC-LumaLeds agreement, is that the parties to that agreement did intend to preserve Epistar's right to contest validity because the carve-out of the limitation of Epistar's statutory right, the one that's in federal patent law, to contest validity is much, much narrower. And so you have to, as a matter of black-letter contract law, harmonize those two agreements. And the only way to harmonize them is to recognize that LumaLeds understood that if it ever went after Epistar over the OMA product or its other products, then it was going to have to defend the validity of the 718 patent. The upshot, by the way, Judge Dyke, you said, we do say that you should construe these provisions narrowly. That's exactly right. Putting aside even the Epistar-LumaLeds agreement, Echolab reiterates the rule that comes from Foster v. Hauko, which Judge Rader joined. And it says, because of Lear v. Atkins, we do construe these things narrowly. And given that they seemingly concede under the Medtronic line of cases that if this were an arbitration agreement, it wouldn't bind Epistar as to everything it did. If it were a covenant not to sue, it wouldn't bind Epistar as to everything that Epistar did. Then it can't be that suddenly you read a covenant not to challenge validity more broadly than you would those other provisions. Perhaps I could spend a little time turning to the claim construction questions about ITO and substrate. To start with the ITO point, we have here, I think, a legal principle and several parts of the 718 patent that point to an intent to disavow ITO. The legal principle is that it's uncontested. But your broad claim language clearly covers ITO, right? I think that's right. It is so sweeping. It is, however. That is what gets us straight to my first legal point. It is so sweeping in its language that there's no question that it's anticipated by the Lawrence patent. Yeah, but in Phillips and in other cases we've said we're not going to look at invalidity except in very unusual circumstances. But that may be the case. But I do think that you have to look at the R2 points in combination. Phillips does say you look at – What have you got left? Because we say, okay, forget about invalidity. Okay, we have the specification. Why does the specification language help you? Because it strikes me that it is directed to disclaim ITO in an entirely different context. Because – let me just – this is going to be at tab one. I'm going to run out of time, but so maybe I can just make the points to you. The criticism of ITO is as it does – No, no, no. You've got to answer the question. Sure. What is it in the language that helps you? Absolutely. So this is going to be at page six of the JA, and it occurs in the bottom of column one. And I'm going to start at the fourth sentence. Such techniques are commonly used in LEDs as well as other devices where current spreading is desired. Even so, most of the light generated is under the opaque metal patterns and is blocked. This is the critical ITO language. Another technique is to use a transparent front electrical contact, which is your point, Judge Dike, such as ITO in DMT and oxide instead of metal. So why isn't that addressed to a contact situation? Right. I could just read the last sentence. Such transparent electrical contacts have high resistivity and lead to high series resistance. Because series resistance is a characteristic of a product, not of a function. The high series resistance of ITO cannot be a function of where it appears on the device. That is in the nature of ITO wherever it appears. The second point is that that description of a front electrical contact is not of the metal bonding pad, which is LumaLED's argument. And you know that for the reason that this is a criticism of the prior art, and there is no prior art use of ITO as a metal bonding pad. I will show you. If you turn to tab nine of the volume one of the JA, if you happen to be looking in the joint appendix version, you will see the Lawrence patent. But there is also no prior art in which the ITO is used the way it is used here. I have an alliance. Figure nine, is that what you're looking at? Yes. I'm sorry. No, I'm at tab nine. Yeah, but I'm looking at the Lawrence patent. Yes, the very first figure. You see there it says AU. That is the metal bonding pad. But what they're criticizing in the 718 patent is what's called here the transparent electrode in the Lawrence patent. And that's just a layer on top. It's not the metal bonding pad. And that function right there, transparent electrode in the Lawrence patent, is precisely what we're doing in our products. It's precisely what was encompassed within the claim construction in this case. So they attempt to convert this reference to a transparent electrical contact to the thing that the wire comes into at the top of the LED. And that's not what it's describing. It's describing this item at the very beginning of the Lawrence patent. If I could reserve the remainder of my time. You may. Thank you, Goldstein. Now, Mr. Jardine, you're trying to split time. Oh, right. That's correct. You can split that time however you wish, meaning you're going to have to stop and give time to your colleague. We won't stop you, all right? OK. And if you take all the time, I'm sorry he doesn't get to argue. So please proceed. May it please the court. The commission in this case determined that there was a violation of Section 337 and supported by proper finance. Particularly Epistar is correctly precluded, inserting the invalidity of the 718 patent. There is a problem here that we have two separate agreements here. And the Epistar agreement seems to preserve the right to raise invalidity questions with respect to the licensed product, if there's a suit on the licensed product. So, I mean, it can't be that this UED agreement covers all situations, right? You'd agree that if there were a suit on the licensed product that they would be able to raise the invalidity question. Right, just in that narrow context. Well, how do we – why is that the way to reconcile them instead of to construe the UED agreement more narrowly as applying only to the products that are being made by UED? All right. Well, basically, Lumiliz is entitled to the benefit of their bargain. They bargained for the right not to. Well, but that's the point. They weren't bargaining about a merged company. They were bargaining about their operations and the products that they were producing at the time. I mean, that's correct, right? I mean, it's a contemplation of the parties at the time of the UED agreement that they weren't thinking about a merger, correct? Well, they were thinking towards any other products or any other subject matter as – Well, produced by UED, but they weren't thinking about the possibility of a future merger, were they? Well, it does apply to successors of interest as well. So it does apply in all future cases as to any other products. Yeah, but the successors of interest clause is just a boilerplate that comes at the end of the agreement, right? Well, it's distinctly part of the dissent judgment provision. Judge Harris expressly said he didn't consider the earlier Epistar agreement, didn't he? The record seems to indicate that, but, again, it's irrespective of the point. The Epistar agreement only carves out just that small instance. Well, how can it be irrespective in the sense that if we're trying to understand the intent of what the parties meant by their contractual agreements, why would Epistar surrender in its merger all the rights that it had paid $5 million to acquire just less than a year before? Why wouldn't those facts in the earlier agreement have a lot to say about the later merger? Again, it goes towards the benefit of the bargain, or in this case, the allegation of the bargain. But if those facts weren't even considered, how confident can we be that the commission properly understood the full terms of the merger and the full implications for future products of this successor and interest clause, the boilerplate clause? Again, if the Epistar agreement said it guarantees Epistar the right to assert invalidity as to all the projects of such and that, then there would be a conflict. But here it only guaranteed the right to assert invalidity in this small little carve-out regarding the current license products that are not at issue in this case. Well, we've said repeatedly, haven't we, that in this area where we're dealing with invalidity issues that we'll construe the agreements narrowly? Right. So if we construe this narrowly, then we construe it as applying only to the UED products or the products produced by the UED division, right? Right. It's to be construed narrowly, but it is to follow the language of the agreement, as in the Foster case, and following with diversity and precise. Well, why can't we say the successor and interest clause does not affect the earlier agreement governing products on which they can challenge validity? Again, I think if you get into this product, either you can assert invalidity or you cannot assert invalidity. And Loomis guaranteed them a bargain for the right not to have to face a validity challenge in the future regarding any other products in the other subject matter. And as soon as you start splitting validity along product distinctions, you take away the right that they bargained for. They should not be deprived of that right due to no fault of their own of Epistar's merger with UEC. Are you familiar with the Brunswick case? Neither party cited it, which I think is a bit odd in a way because it's sort of quite similar to this. It's a Seventh Circuit case, and it seems to hold that under circumstances like this that the consent decree or an agreement is only going to apply to the same types of products that the bargaining company was producing before the merger. You're not familiar with that? Not exactly, but again, I mean, the language is clear as to any other products, any other subject matter, consistent with the case law that it follows the language. If the language says you may not assert invalidity as to these circumstances, the court should enforce those language provisions indicating that parties— But we haven't in the past, right? In Medco and these other cases, there's been a broad language, and we haven't construed it broadly. We've construed it narrowly, right? Some of the Medtronic? Medtronic, yeah. Again, Medtronic, I think an important point left out by Epistar in their briefing is that it's absent a provision otherwise that you don't expand an assignment. Here we do have that provision otherwise. We do have this expressed language as to any other products, any other subject matter, applying to successors and interests. It reflects the party's intent as to bind UEC and U.S. successors, including Epistar in this case, as to concluding against asserting invalidity to settle an A patent. Again, briefly, touching on the point regarding the claim construction. Again, it's— These were products produced solely by Epistar before their pre-merger products, and there's just an awful lot which suggests to us that perhaps if Judge Harris had considered that earlier Epistar agreement and the implications of it, he may have construed it narrowly, too. Again, I strongly urge that it's irrespective of the point. As long as this Epistar agreement did not carve out a larger right to assert invalidity in other matter, it only was towards the current licensed products, which, again, responds to this court's inquiry, J13000 and 13-6. All parties pretty much admit that those products are not at issue in this case, which makes that clause irrespective of the point that Lula-Lenz is entitled to the benefit of their bargain, their bargain for the right not to face a burdened challenge in the future regarding any future products, new material, different products, applying to any successor and interests. Yes, they bargained for that with the UEC, and at the time that had a pretty restricted meaning, the things that UEC produces and would produce in the future. The merger kind of provides Lula-Lenz with a bit of a windfall, doesn't it? It gets to avoid an earlier agreement. No, I wouldn't say that. Again, you cannot split assertion of validity along product lines and their entitled to the benefit of the bargain. It would make pretty much the rest of the consent judgment meaningless. As it says, this provision doesn't apply where a court of competent jurisdiction and third-party action presumably found the patent valid. But I don't understand how it makes it meaningless. How does it make it meaningless? If you make this product distinction and allow Epistar to assert invalidity regarding these, as they call them, pre-merger products, that pretty much takes away that. You mean the agreement isn't very effective in the situation where we have a merger? It doesn't render it meaningless in its original context, does it? I said if you allow this product distinction to carry through and you allow Epistar to assert invalidity, that is a revocable loss of that right to Lula-Lenz that they bargained for. It's right not to face a validity judgment. But there's no suggestion that there was manipulation here, that the merger was designed to get out from under the agreement, right? No, but this shouldn't be deprived of the right they bargained for through no follow-on to this merger. I see my time is running down, but again, I would radiate that. Do you want to deal with the claim construction issue? I think I'll leave that for any of you to counsel. Okay. Thank you, Mr. Jardim. Mr. Lyons? He was kind. He gave you almost all your time. Thank you, Your Honor. If I could just make a few comments about the contract to issue. First of all, at the time that that agreement was reached, the parties had been litigating for years, two years. They had received some re-judgment. Which parties? This is UEC and Lumi-Lenz. And so at the time that they reached that settlement— And you'd had a similar lengthy litigation period with Epistar, hadn't you? And that led to, after payment and settlement and payment of $5 million, you'd reached an entirely different agreement with those products, right? That's right. So the lengthy period of negotiation cuts both ways, right? I would disagree with that, Your Honor, for this reason. In the later agreement, there was no preservation of Epistar's right to challenge validity. That's certainly what they contemplated, though, right? Pardon me, Your Honor? The agreement certainly contemplated that they'd be able to challenge validity under any circumstances. And it says specifically with respect to any suit claiming infringement with respect to the licensed products they can raise that the assumption must be that they can raise it across the board, right? In the Epistar agreement, it left undisturbed what rights they may or may not have to its products. But the assumption in the agreement was that they were not being deprived of their right to challenge invalidity under any circumstances, right? Well, no, they surrendered the right to challenge validity in future cases involving licensed products. And the agreement was silent as to if it would be unlicensed products. No, I thought what the agreement said was that they wouldn't raise it as to the licensed products unless there was an infringement suit on the licensed products. Is my memory correct? Right. Well, the agreement, the language says Epistar agrees it will not assert in connection with any future dispute between Lumileds and Epistar regarding Epistar's current licensed products that the 718 patent is invalid or unenforceable. The language goes on to say provided Lumileds does not assert infringement of the licensed products. Right. What it's designed to do is to say you can't get out from under the royalty payments by raising an invalidity question. But if there's a suit for infringement, yes, you can assert invalidity, right? Well, no, it doesn't say we're going to preserve any rights. It says we're not – it doesn't even comment on it. It's silent. But what I'm saying is that they contemplated that in an infringement suit the invalidity could be raised as a defense, right? If they have that right. It was silent on it. It doesn't say that you will. It just doesn't enter into what rights you have. But the language is not explicit. But the contemplation clearly was that if they got sued for infringement, even on the licensed products, they could assert invalidity as a defense, right? Well, not on the licensed products. If it was in unlicensed products, they were silent as to whether they could do it. So unless something prevented them, they would be able to do it. And in this case, Epistar specifically chose to assume the rights of UEC. And in the UEC agreement, first of all, I would take issue with – Can I interpret the vigor of your defense as an admission that your patents are pretty vulnerable to invalidity challenges, particularly the Lawrence patent and enablement? Far from it, Your Honor. As I said, this is a case in which we already have – That's all I need to hear. It's not before us. But – We already have summary judgment rulings on that. Yeah, that's fine. I don't need to hear any more. I just was tweaking you a little bit. The consent judgment, just to show how this is not boilerplate, it says this agreement will constitute race judicata. We'll have issue and claim preclusive effect between the parties and their successors as to validity. This isn't boilerplate, Your Honor. This is the party saying we need to put this issue to bed. We've litigated it for years. We're not going to litigate with UEC any further, not in this case, not in a future case. It doesn't matter what the products are. Can we switch to the ITO? Sure. The spec teaches away. The prosecution history seems to teach away from considering the ITO within this claimed invention. And, indeed, the inventor himself didn't consider the ITO at the time to be within his invention. Why should we? The patent only refers to the use of ITO as a contact. It never says anything to disparage or suggest it couldn't be used as a window. And that's a very important distinction because there is never— What about the prosecution history? Well, the prosecution doesn't even enter. There was nothing in the prosecution where they suggested or hinted that something like ITO would be excluded. In fact, they don't even refer to ITO. They were distinguishing the Watanabe prior art reference, saying, look, this is a different material system. These are Allen gap LEDs. You've got this gallium arsenide phosphide LED. That's a different technology. And, you know, all these different crystals have different characteristics. So there's really nothing in the file history I think they can hang their hat on. Does the Lawrence patent show the use of ITO as a window? It does. Not in an Allen gap LED, not to address the problem that the 718 is directing, which is the current crowding problem in an Allen gap LED. It's just that's absent from Lawrence. Lawrence happens to have an ITO layer. There's no suggestion that that was invented by this patent. I think the critical thing— Is the Lawrence patent referred to in the background here? The specification doesn't say that it's talking about the Lawrence patent. I know counsel for Epistar suggested— So there's no reference in the specification of the Lawrence patent? No, no, you're wrong. No, it's not an Allen gap LED. I understand, but there's no reference in the specification. No, no, you're wrong. In the specification, it refers to the use of ITO as a contact as having high resistivity and high series resistance. But everyone in the case agreed ITO as material has a very low resistivity. That's never been disputed. What causes the resistance is the interface. A contact has very different interfaces than a window. When you say a contact has high resistance because of its interfaces, that has no bearing on its use as a window layer. In fact, Epistar has agreed to that very fact, and they've noted that the contact, unlike a window layer, is used for wire bonding. Epistar agrees it's very difficult to use something like ITO as a contact with the wire bond. That's why they agree with the patent statements that if you use it as a contact, you have problems. There's nothing in the patent that suggests that you couldn't use it as a window that covers the whole width of the device. Actually, the window layer on top of it has the metal contact. That's the best and easiest way to contact a layer. That's one of the reasons why ITO... I have a legal interpretation question for you. What do you think that red light means? I think I'm done, Your Honor. Thank you, Mr. Lyons. You have a little more than a minute left, Mr. Goldstein. Thank you, Your Honor. On the question of whether or not what we're doing here renders the UEC-Lumilenz agreement meaningless, it doesn't. The issue arose because they decided to accuse the Set-R OMA product, the Epistar one, if they had done what they originally did before the ITC, which was accuse the MB and GB, even post-merger the agreement would have been fully enforced. The answer back is that this contract says it will have race judicata effect, but a line of decisions, including Medtronic, including Judge Duffy's Brunswick opinion for the Seventh Circuit, say, well, what race judicata means in the successorship context is that to which the successor is in privity with the original company, and you are in privity with respect to the original products. We are in privity as to GB and MB, but nobody seriously contends that we are with respect to OMA. And so what's happened here is that they are, notwithstanding our separate Epistar agreement, the inescapable consequence was we paid for the right to be able to contest divinity. If they came after us on OMA, they are getting rid of that, contrary to the party's understanding. Thank you very much. Thank you very much, Mr. Goldstein.